David GREENFIELD and
The Photographers,
Inc., Plaintiffs,

v.

TWIN VISION GRAPHICS, INC. a/k/a
Twin Vision, Inc., Defendant.

David Greenfield and The
Photographers, Inc.,
Plaintiffs,

v.

The Matzel & Mumford Organization,
Inc., Defendant.

Civ. No. 98–2802(HAA).

United States District Court,
D. New Jersey.

June 26, 2003.

---

Gil D. Messina, Cassidy Messina & Laffey, P.C., Holmdel, NJ, for Plaintiff.

John F. Whitteaker, Jennifer R. Adler, McElroy, Deutsch & Mulvaney, LLP, Morristown, NJ, for Defendants Twin Vision, Inc., Frank Rod, Carol Rod, John Rod and Norma Rod.

Thomas Daniel McCloskey, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP, Woodbridge, NJ, for Defendants the Matzel and Mumford Organization, Inc.

## OPINION & ORDER

ACKERMAN, Senior District Judge.

This matter comes before the Court on motions for summary judgment by Plaintiffs David Greenfield ("Greenfield") and the Photographers, Inc. ("TPI") (collectively, "Plaintiffs"); a motion for summary judgment by Defendant Twin Vision Graphics, Inc. ("TVG"); and a motion to dismiss by Defendant the Matzel and Mumford Organization, Inc. ("M & M"). For the reasons outlined below, Plaintiffs' motion is GRANTED IN PART and DENIED IN PART; TVG's motion is GRANTED IN PART and DENIED IN PART; and M & M's motion is DENIED.

### TABLE OF CONTENTS

Background

I. Facts ................................................... 361
 A. TVG ................................................. 361
 B. M & M ............................................... 365

II. Procedural History ...................................... 366

Analysis

I. Subject Matter Jurisdiction ............................. 368

II. Summary Judgment ........................................ 372
 A. Summary Judgment Standard ........................... 372
 B. Contract Claims ..................................... 373
 1. Invoices ......................................... 373
 2. Course of Dealing ................................ 375
 C. Liability of Individual Defendants .................. 376

D. Copyright Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
 1. TVG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
 (a) Unauthorized Use of Photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
 (b) Unauthorized Display of Photographs . . . . . . . . . . . . . . . . . . . . . . . . 378
 2. M & M . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381
 3. TVG and M & M: Implied, Non-exclusive License . . . . . . . . . . . . . . . . . . 382
E. Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 384
F. TVG Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385

III. Statutory Damages and Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385

### Background

## I. Facts

Although many important facts are disputed, the parties appear to agree upon the following: Plaintiff David Greenfield is a professional photographer who, at all times relevant to this action, was employed by Plaintiff TPI. Second Amended Complaint Against TVG (hereinafter "TVG Complaint"), ¶ 7. TPI is authorized to market and sell Greenfield's services as a commercial photographer and to license the use of Greenfield's original photographs to others. Complaint, ¶ 8.

Plaintiffs began supplying Greenfield's photographs to Defendant TVG in 1990. Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Facts"), ¶ 4. TVG designs and builds displays for on-site sales centers of residential building developers. Statement of Undisputed Material Facts ("TVG's Facts"), ¶ 1. TVG used Greenfield's photographs as part of these displays at various sales centers. TVG's Facts, ¶ 5.

Defendant M & M was one of TVG's clients, and is engaged in the development and construction of high-end, single-family homes. In the fall of 1990, John Rod, the Vice President and Director of Marketing for TVG, introduced Greenfield to Ken Bertch, the Director of Marketing for M & M. Plaintiffs' Facts, ¶ 6; M & M's Statement of Undisputed Material Facts in Opposition to Plaintiffs' Motion for Summary Judgment ("M & M's Facts"), ¶ 1. Although TVG facilitated the relationship between Greenfield and M & M, TVG never assigned Greenfield to take photographs for M & M. TVG's Facts, ¶ 57. Instead, shortly after Bertch met Greenfield, M & M began procuring Greenfield's photography services directly through TPI. *Id.*, ¶ 56. By all accounts, Greenfield maintained a good working relationship with both TVG and M & M for several years.

### A. TVG

Over the course of their relationship, TVG and TPI engaged in numerous transactions for the use of Greenfield's photographs. In at least some of these transactions, TVG submitted a written purchase order form, while for other transactions TVG would request photographs orally. Affidavit of John F. Whitteaker ("Whitteaker Aff.") Ex. 8, Deposition of David Greenfield ("Greenfield Dep."), 96:17–23.[1]

---

1. In his deposition, Greenfield explained that "I would not have required [the purchase order] in writing if there were one, if there was one [photograph] number or two. If there were a number of items listed, I wanted to be sure that they were accurate" and therefore Greenfield would use a purchase order form for larger orders. *Id.* at 98:10–13. TVG asserts that the "purchase order would state all of the key terms necessary to form a contract." TVG's Brief in Opposition, at 1. TVG has submitted only one copy of a purchase order, which provides the date, quantity, and type of photograph requested; however, the purchase order does not appear to indicate a price, and is unsigned.

Greenfield would usually personally deliver TPI invoices to his customers along with the requested photographs. Greenfield Aff., ¶ 9.[2] During the course of TPI's dealings with TVG, Greenfield tendered approximately 130 invoices to TVG. One hundred of these invoices were signed by John Rod, Carol Rod or Frank Rod, each of whom is a principal of TVG.[3] Greenfield Aff., ¶ 17.

Each invoice describes the price, quantity, and type of photograph purchased, and describes the purpose for which the photographs will be used. Each invoice also states that "the terms and conditions on the reverse side apply unless specifically stated otherwise." Whitteaker Aff., Ex. 16; Greenfield Aff., Ex. A. The reverse side of each invoice lists a number of terms and conditions:

(2) Except as otherwise specifically provided herein, all photographs and rights therein, including copyright, remain the sole and exclusive property of Photographer. Any additional uses require the prior written agreement of Photographer on terms to be negotiated. Unless otherwise provided herein, any grant of rights is limited to one (1) year from the date hereof for the territory of the United States.

(3) Client assumes insurer's liability (a) to indemnify photographer for loss, damage, or misuse of any photograph(s) and (b) to return all photographs prepaid and fully insured . . .

. . . . . . . . . . . . . . . . . . . . . . .

(6) Photographer's copyright notice "@ (year as marked on photo) DAVID

GREENFIELD" must accompany each use as an adjacent credit line. Invoice amount will be tripled if said credit is not provided.

. . . . . . . . . . . . . . . . . . . . . . .

(8) Client will indemnify and defend Photographer against all claims, liability, damages, costs, and expenses, including reasonable legal fees and expenses, arising out of the use of any photograph(s) for which no release was furnished by the photographer, or any photographs which are altered by Client. Unless furnished no release exists . . .

(9) . . . Client and its principals, employees, agents and affiliates, are jointly and severally liable for the performance of all payments and other obligations hereunder. No amendment or waiver of any terms is binding unless set forth in writing and signed by the parties. This agreement incorporates by reference Article 2 of the Uniform Commercial Code, and the Copyright Act of 1976, as amended.

(10) Except as provided in (11) below, any dispute regarding this agreement shall be arbitrated in Monmouth County, New Jersey, under rules of the American Arbitration Association and the laws of New Jersey . . .

(11) Client hereby consents to the jurisdiction of the Federal courts with respect to claims by photographer under the Copyright Act of 1976, as amended.

(12) All Photographs supplied by the Photographers, Inc. are copyrighted by the Photographer according to the provisions of the U.S. Copyright Act of 1976

**2.** It is not entirely clear from the submissions of the parties whether Greenfield provided an invoice every time he provided photographs to a customer.

**3.** Frank Rod served as President of TVG. Whitteaker Aff., Ex. 10, at 6. John Rod served

as Vice President and Secretary of TVG. *Id.* at 5. It is not clear from the parties' submissions what position Carol Rod held, however neither TVG nor Carol Rod dispute that she was a principal of TVG.

(Title 17 of the United States Code); and the Bern Convention. Whitteaker Aff., Ex. 16; Greenfield Aff., Ex. A.

In February 1994, TVG hired Greenfield to provide eighteen photographs for the Whittingham development, a project built by U.S. Homes, one of TVG's clients. Greenfield provided the photographs, for which John Rod signed an invoice dated February 21, 1994. The invoice for these photographs provides, "use of 18 color photographs from stock of various Whittingham Town Center and lifestyle scenes. For use in Sales Center displays at Greenbrier at Whittingham Sales Center (U.S. Homes), Monroe Township." Whitteaker, Aff., Ex. 16; Greenfield Aff., Ex. I. The invoice included the terms and conditions quoted above, and was signed by Carol Rod. *Id.* TVG purchased an additional 16 enlargements for the Whittingham project, under the same terms, by an invoice dated March 11, 1994. Carol Rod signed the invoice for these photographs as well. Greenfield Aff., Ex. K.

Similarly, in 1996, TVG hired Greenfield to provide six photographs for the Vineyards development, a project built by Vintage Builders, another of TVG's clients. Greenfield provided the photographs, and John Rod signed an invoice dated April 3, 1996, for the amount of $1,719.00. Greenfield Aff., Ex. A. The invoice provides "[l]easing of 6 stock photo images ... [f]or use only in Sales Center display by Vintage Communities, Inc., at the Vineyards in Diamond Ridge, Jackson, NJ." *Id.* As with the Whittingham project, the invoice included the terms and conditions quoted above.

Things began to go sour on April 11, 1996. On that date, John Rod initiated a conference call with Greenfield and M & M's advertising agent. During the call, Rod mentioned that TVG possessed negatives of photographs of an M & M design center taken by Greenfield. "TVG's Facts, ¶ 61; Greenfield Aff.", ¶ 21. Greenfield expressed surprise and disapproval of TVG's possession of these negatives. *Id.* Upon Greenfield's request, Rod mailed the negatives to Greenfield. TVG's Facts, ¶ 62; Greenfield Aff., ¶ 21. These negatives were actually "internegatives," which are made by taking a picture of a transparency or slide. Greenfield Aff., ¶ 24. This picture can then be used to make duplicate pictures in the same way as a negative. *Id.* Because Greenfield had never provided TVG with internegatives or authorized TVG to create internegatives, Greenfield concluded that TVG had been illicitly copying his photographs without his permission. After this incident, Greenfield began to suspect that other photographs he had supplied to TVG and M & M were being misused. Greenfield Aff., ¶ 26.

Following the April 11 phone conversation, Greenfield met with Roger Mumford, a principal of M & M. Mumford acknowledged that TVG had supplied M & M with enlargements of some of Greenfield's photographs for which TPI had not been compensated. Supplemental Affidavit of John Whitteaker ("Whitteaker Supp. Aff."), Ex. 30; Greenfield Dep., 51:9–22. The parties agreed that M & M would pay TPI for the enlargements at the same price TPI would have charged if the photographs had been properly ordered from TPI. *Id.* This transaction was reflected in an invoice, dated June 27, 1996, for twenty enlargements totaling $688.21. Certification of Thomas D. McCloskey ("McCloskey Cert."), Ex. A, Bates # 0058, 0060. The invoice stated "[f]or use in various Sales Center designs" and was signed by Ken Bertch.

In April 1997, Greenfield visited the Vineyards sales display. Greenfield discovered that the six photographs which he

had licensed to TVG in April, 1996 remained displayed at the Vineyards beyond the one-year term provided in paragraph (2) of the invoice. Greenfield Aff., ¶ 28. Moreover, none of the photographs contained the "adjacent credit line" identifying Greenfield as the photographer, as required by paragraph (6) of the invoice. Pursuant to paragraph (6) of the invoice, on April 21, 1997, TPI billed TVG for $4,500, an amount slightly less than three times the amount of the original invoice. Greenfield Aff., Ex. G. After receiving no response, TPI sent TVG a revised invoice in which it offered to extend the license through April 2, 1998 at no additional charge. Greenfield Aff., Ex. H. TVG did not pay either invoice, however TVG's employees removed Greenfield's photographs from the Vineyards sales office, and discarded them in a dumpster. Affidavit of Gil D. Messina in Support of Plaintiffs' Motion ("Messina Aff."), Ex. H., Deposition of Frank Rod ("F. Rod Dep."), 49:3–25. On April 25, 1997, Greenfield filed for a copyright registration of his photographs which had been displayed at the Vineyards sales center. Greenfield Aff., ¶ 52.

In February, 1998, Greenfield visited the Whittingham sales office. As with the Vineyards project, Greenfield discovered that his Whittingham photographs were also displayed beyond the one-year license term, and without the required adjacent copyright credit line. Greenfield Aff., ¶ 33. TPI invoiced TVG for each additional year the photographs had been displayed, and tripled the invoice amount due to failure to display the adjacent credit line. As with the Vineyards project, TVG removed and discarded Greenfield's photographs after receiving the additional invoices, which remain unpaid. Messina Aff., Ex. H., F. Rod. Dep., 79:13–19. On April 22, 1998, Greenfield filed for a copyright registration of the photographs which had been

displayed at the Whittingham sales center. Greenfield Aff., ¶ 52.

At this point, the claims of the parties begin to diverge. With respect to the internegatives TVG supplied to M & M, Plaintiffs argue that the fact that John Rod possessed internegatives of Greenfield's photographs indicates that TVG unlawfully copied Greenfield's work. In addition, Plaintiffs cite to John Rod's deposition testimony, wherein he admitted producing negatives from Greenfield's slides, and acknowledged that TVG was not permitted to use Greenfield's photographs for any purpose beyond that specified in the original license. Messina Aff. Ex. I, Deposition of John Rod ("J. Rod Dep."), 28:12–14; 98:4–12. Plaintiffs argue that TVG copied Greenfield's works for M & M, and then billed M & M for works that M & M did not own, thus exceeding the scope of the license and violating Greenfield's copyrights.

With respect to both the Whittingham and Vineyards projects, Plaintiffs argue that TVG knowingly flouted the limits of the license by displaying the photographs in excess of one year and without the adjacent copyright credit line. Moreover, with respect to the Vineyards project, Plaintiffs also allege that TVG sold what it represented to be the "photo rights" in Greenfield's photographs to the Vineyards in April, 1996.

TVG does not deny many of Plaintiffs' assertions. TVG argues, however, that the invoice language on which Plaintiffs rely does not apply to the TVG–TPI transactions. Instead, TVG argues that the purchase orders, and not the invoices, constitute the relevant contract between the parties. Although TVG concedes that a substantial majority of the invoices at issue were signed by a TVG principal, TVG argues that the signers never read or understood the terms and conditions provid-

ed in the invoice, and therefore the invoices cannot represent a meeting of the minds between the parties.

Alternatively, TVG argues that even if the invoices do, as a general matter, represent the relevant agreement between the parties, Greenfield gave an implied consent to TVG's use of the photographs in a manner contrary to the terms of the invoices. Whitteaker Aff. Ex. 9, Greenfield Dep., 79:15–23. With respect to the Whittingham and Vineyards displays, TVG concedes that Greenfield's photographs were displayed without the required adjacent copyright credit line. TVG's Facts, ¶ 14. TVG claims, however, that on a visit to the Whittingham sales center on January 3, 1995, Greenfield observed his photographs displayed without proper attribution, and failed to lodge any objection. *Id.*, ¶ 13. TVG therefore argues that Greenfield's actions led TVG to reasonably believe that Greenfield had no objection to TVG's display of his photographs in this manner.

Similarly, TVG concedes that Greenfield's photographs were displayed at the Whittingham and Vineyards sales centers for longer than the one-year term authorized in the invoices. TVG asserts, however, that Greenfield was aware of TVG-designed sales centers in which Greenfield's photographs had been displayed beyond one year. TVG's Facts, ¶ 13. In addition, TVG alleges that Greenfield knew that TVG used his photographs at its trade show booths in annual conventions from 1993 through 1997. TVG's Facts, ¶ 32.

Thus, as with the failure to provide the copyright attribution, TVG argues that Greenfield's failure to object to TVG's display of his photographs beyond the one year term constitutes an implied consent to TVG's continued use of the works.

Finally, with respect to the four internegatives that TVG supplied to M & M, TVG admits that it copied Greenfield's four photographs to provide enlargements for M & M. TVG's Facts, ¶ 60. TVG argues, however, that because M & M paid TPI for the display of these prints, as reflected in the June 27, 1996 invoice, TPI has no claim against TVG. TVG's Brief in Opposition, at 6 [4].

### B. M & M

Greenfield began supplying photographs to M & M in 1990 or 1991. Greenfield Aff., ¶ 36.[5] Greenfield supplied photographs to M & M utilizing the same procedure as with TVG: M & M representatives would contact Greenfield with an order, and Greenfield would deliver the photographs, along with an invoice on the same terms quoted *supra,* page 362. M & M's Facts, ¶ ¶ 4–5, Greenfield Aff., ¶ 9. Plaintiffs allege, and M & M does not appear to dispute, that of the 168 invoices submitted by Greenfield to M & M, only 13 are unsigned. The vast majority of these invoices were signed by Ken Bertch, while others were signed by Roger Mumford. McCloskey Cert., Ex. A.

**4.** For the sake of convenience, the Court will refer to the various parties' briefs as "[Party Name]'s Brief in Support; [Party Name]'s Brief in Opposition; or [Party Name]'s Brief in Reply". The briefing on Plaintiffs' additional motion for partial summary judgment against M & M will be referenced as Plaintiffs' Brief in Support of Cross–Motion; M & M's Opposition to Cross–Motion, and Plaintiffs' Brief in Reply on Cross–Motion.

**5.** There appears to be a slight discrepancy concerning when Greenfield and TPI began supplying photographs directly to M & M. Greenfield asserts that this began in early 1991, while M & M appears to claim that the direct relationship began a bit earlier, in 1990. Greenfield Aff., ¶ 36; M & M's Facts, ¶ 3. This discrepancy is irrelevant for purposes of determining the instant motion.

By all accounts, Greenfield and M & M enjoyed a harmonious relationship through early 1996. Indeed, between 1992 and 1994, M & M twice won the prestigious SAM Community of the Year award (the "SAM Award") for its displays using Greenfield's photographs. Affidavit of Gil D. Messina in Opposition to Motion to Dismiss ("Messina Cross–Aff."), Ex. A., Deposition of Kenneth Bertch ("Bertch Dep."), 69:20–70–3. As with TVG, however, Greenfield's relationship with M & M deteriorated in 1996.

In early 1997, Greenfield visited every active M & M sales center. Greenfield discovered that many of his photographs were on display at sites for which they had not been ordered, while others had been illicitly incorporated into M & M promotional materials without Plaintiffs' knowledge or consent. Greenfield Aff., ¶ 38. None of the photographs displayed had the required adjacent copyright credit line. *Id.* In addition, photographs at three displays had been on display for over a year after they had been ordered.[6] Greenfield Aff., Sch. 1.

On April 1, 1997, TPI sent 14 invoices to M & M, demanding triple the costs for failure to display the adjacent copyright credit line pursuant to paragraph (6) of the invoice. Greenfield later discovered that M & M was also using his photographs on its website, and on February 14, 1998 TPI invoiced M & M for $9,540 for this use. M & M did not pay any of these invoices.

As with TVG, Plaintiffs have a fundamental dispute with M & M concerning the significance of the invoices. Greenfield alleges that when he began his relationship with Bertch, Greenfield offered to review the terms and conditions of the invoice with him, but Bertch assured Greenfield that Bertch was already familiar with the terms and conditions. Greenfield Aff., ¶ 9. In their deposition testimonies, both Mumford and Bertch denied that Greenfield ever offered to review the terms and conditions, and Bertch denied that he was familiar with the terms and conditions. McCloskey Cert., Ex. N., Bertch Dep., 28:4–29:17; Ex. O., Deposition of Roger Mumford ("Mumford Dep."), 71:8–14.

While M & M, like TVG, acknowledges that its officers signed the invoices, M & M similarly argues that neither Bertch nor Mumford ever understood or agreed upon the terms and conditions contained in the invoices. Instead, M & M argues that Bertch and Mumford understood the agreement to permit M & M to use Greenfield's photographs for any purpose it chose, and that their signature simply confirmed the pricing and receipt of the photographs. McCloskey Cert., Ex. O, Mumford Dep., 59:20–60:4; 69:14–72:2.

Indeed, M & M argues that Plaintiffs' true motivation in bringing the instant action has nothing to do with M & M's alleged violations of the terms of the invoice. M & M claims that approximately 5–6 years into their relationship, Bertch became dissatisfied with Greenfield's work. Bertch decided to use another photographer for M & M's entry in the 1995 SAM Award competition, and subsequently hired a different photography company for most new assignments. M & M asserts that during the entire course of their relationship, Greenfield had never objected to M & M's use of his photographs, and that his sudden objections in 1996 were purely the result of "sour grapes" over M & M's decision to use other photographers. M & M's Brief in Opposition, at 3.

## II. Procedural History

Plaintiffs filed two actions in this case. On June 12, 1998, Plaintiffs filed a five-

---

**6.** Greenfield discovered photographs on display for longer than one year at M & M sales centers at Beacon Manor, Staats Farm, and Beacon Crest.

count complaint against TVG and Defendants Frank, John, Norma and Carol Rod (collectively, "the Rods"). Count I alleges copyright infringement under the Copyright Act; Count II alleges Lanham Act violations; Count III alleges breach of contract; Count IV seeks a *quantum meruit* recovery based upon an implied contract; and Count V alleges that each of the Rods are personally liable for any damages inflicted by TVG upon Plaintiffs. On June 15, 1998, Plaintiffs filed a complaint raising substantially similar claims against M & M.[7] On September 17, 1999, TVG filed a counterclaim, asserting that TPI had failed to return photographic material belonging to TVG. TVG subsequently amended the counterclaim to include three counts against Plaintiffs for consumer fraud, breach of the covenant of good faith and fair dealing, and interference with TVG's prospective economic advantage. On March 20, 2003, then-Magistrate Judge Dennis Cavanaugh consolidated the two actions.

On April 8, Plaintiffs filed a motion for partial summary judgment on various aspects of its claims. Plaintiffs seek summary judgment against TVG under Count I of the complaint for displaying Plaintiffs' photographs in excess of one year, and for unlawfully copying four of Greenfield's photographs which TVG supplied to M & M. Plaintiffs further seek summary judgment against TVG under Count III of the complaint for TVG's failure to display the adjacent copyright credit line and subse-

quent destruction of photographs displayed at the Whittingham and Vineyards projects. Plaintiffs also seek summary judgment for these claims against John Rod and Carol Rod individually on the specific invoices signed by each of them. Finally, Plaintiffs seek a dismissal of TVG's counterclaims. With respect to M & M, Plaintiffs seek summary judgment under Count I of the complaint for displaying Plaintiffs' photographs in excess of one year, and for the unauthorized use of Plaintiffs' photographs on the M & M website. Plaintiffs further seek summary judgment against M & M under Count III of the complaint for M & M's failure to return certain of Greenfield's photographs, and for M & M's failure to display the adjacent copyright credit line.[8]

Also on April 8, M & M filed a motion to dismiss the Plaintiffs' complaint, arguing that Plaintiffs have failed to state a claim "arising under" the federal copyright laws, and therefore the Court lacks subject matter jurisdiction over this case. On that same date, TVG and the Rods filed a motion for summary judgment on all counts of Plaintiffs' complaint against them.

In response to the motion to dismiss filed by M & M, Plaintiffs filed a new, additional cross-motion for partial summary judgment against M & M for infringements arising out of M & M's copying of a number of Greenfield's photographs displayed in M & M's sales centers.[9]

---

7. Count I of the M & M complaint alleges copyright infringement under the Copyright Act; Count II alleges Lanham Act violations; Count III states a claim for breach of contract; Count IV seeks a *quantum meruit* recovery based on an implied contract; and Count V recites a recent merger of M & M's predecessor and designates M & M as the defendant in this action.

8. Because then-Magistrate Judge Cavanaugh bifurcated discovery in this case, discovery on damages is not scheduled to occur until after this Court decides the instant motions. Therefore, the parties' motions concern only the question of liability.

9. Plaintiffs filed this new cross-motion pursuant to Local Rule 7.1(f), which states that a "cross-motion related to the subject matter of the original motion may be filed by the re-

## *Analysis*

### I. Subject Matter Jurisdiction

■ As an initial matter, the Court must determine whether there is federal jurisdiction over this case. This issue presents a seemingly straightforward question: where a licensor of copyrighted materials alleges that the licensee has used the materials in a manner exceeding the scope of the license, may the licensor bring an action in federal court "arising under" the federal copyright laws? Under the facts of this case, the Court concludes that the answer is yes.

Both TVG and M & M (collectively "Defendants") argue that Plaintiffs have failed to make out a claim under either the Copyright Act or the Lanham Act, and, instead, Plaintiffs have at best set forth a "garden variety" contract claim which happens to involve copyrighted material. M & M's Brief in Support, at 19; TVG's Brief in Support, at 10. Because there is no diversity in this matter, M & M argues that the Court should dismiss Plaintiffs' claims under the Copyright Act and Lanham Act, and remand Plaintiffs' contract claim to state court.

Plaintiffs allege jurisdiction based on 28 U.S.C. § 1338(a), which provides as follows:

> The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

28 U.S.C. § 1338(a) (2003).

As another federal court has noted, "the line between cases that 'arise under' the copyright laws, as contemplated by § 1338(a), and those that present only state law contract issues, is a very subtle one and the question leads down 'one of the darkest corridors of the law of federal courts and federal jurisdiction.'" *Marshall v. New Kids on the Block Partnership*, 780 F.Supp. 1005, 1008 (S.D.N.Y. 1991) (quoting *Arthur Young & Co. v. Richmond*, 895 F.2d 967, 969 n. 2 (4th Cir.1990)). Our own circuit has not directly addressed the difficult question of when a case sounds in copyright rather than contract. The most frequently-cited test is that formulated by Judge Friendly nearly thirty years ago:

> Mindful of the hazards of formulation in this treacherous area, we think that an action 'arises under' the Copyright Act if and only if the complaint is for a remedy expressly granted by the Act, e.g., a suit for infringement or for the statutory royalties for record reproduction, (internal citations omitted) or asserts a claim requiring construction of the Act ... or, at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim. The general interest that copyrights, like all other forms of property, should be enjoyed by their true owner is not enough to meet this last test.

*T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 828 (2d Cir.1964). *See also, e.g., Effects Assocs., Inc. v. Cohen*, 817 F.2d 72, 73 (9th Cir.1987); *Royal v. Leading Edge Products, Inc.*, 833 F.2d 1, 2 (1st Cir.1987); *Goodman v. Lee*, 815 F.2d 1030, 1031 (5th Cir.1987); *Arthur Young & Co.*, 895 F.2d 967, 970; *Sullivan v. Naturalis, Inc.*, 5 F.3d 1410, 1412 (11th Cir.1993) (each adopting the *Eliscu* test); *Bassett v. Mashantucket Pequot Tribe* 204 F.3d 343, 350 (2d Cir.2000) (noting that the *Eliscu*

sponding party together with that party's opposition ..." L.Civ.R.7.1(f) (2003).

test "has been adopted by all the circuits that have considered the question whether a suit arises under the Copyright Act for purposes of Section 1338, if the disputed issues include non-copyright matters.").

As a general matter, a federal court looks to the allegations set forth in the plaintiff's complaint to determine whether the court has subject matter jurisdiction. *Heilman v. U.S.*, 731 F.2d 1104, 1111 (3d. Cir.1984). In the copyright context, "[i]t is clear that a claim alleging infringement arises under the copyright laws when the copyright owner and the alleged infringer are complete strangers who have never had any dealings with one another." *New Kids on the Block*, 780 F.Supp. at 1008 (citing P. Goldstein, Copyright § 13.2.1.1 (1989)). On the other hand, "where a suit is for a naked declaration of copyright ownership without a bona fide infringement claim, federal courts decline jurisdiction." *Vestron*, 839 F.2d at 1381 (9th Cir. 1988) (citing *Topolos v. Caldewey*, 698 F.2d 991, 994 (9th Cir.1983)); *see also Eliscu*, 339 F.2d 823. Similarly, if the plaintiff-licensor "seeks relief directly under the licensing agreement, for example the payment of royalties prescribed by the agreement, then the claim is merely a state law contract claim and there is no federal jurisdiction." *New Kids on the Block*, 780 F.Supp. at 1008. The more difficult cases are those, such as the instant case, involving parties to a license agreement where it is alleged that one of the parties used the copyrighted material beyond the scope of the agreement, thus infringing the licensor's copyright.

Both M & M and TVG argue that because determination of this lawsuit will ultimately turn on principles of New Jersey contract law, Plaintiffs' claims sound in contract, and therefore Plaintiffs complaint cannot be said to "arise under" either the Copyright Act or the Lanham Act. In its motion to dismiss, M & M places heavy reliance upon *Clausen Co. v. Dynatron/Bondo Corp.*, 889 F.2d 459 (3d Cir. 1989). In *Clausen*, Dynatron had initially filed an action against Clausen for patent infringement. That action was settled pursuant to a Settlement Agreement in 1977. In 1982, however, Clausen allegedly again began to infringe the patent, in violation of the Settlement Agreement. Dynatron brought an action in federal court for breach of contract, and the court below granted summary judgment to Clausen, on the ground that the Settlement Agreement as a matter of law constituted patent misuse.[10]

On appeal, the Third Circuit noted that because the order appealed from dealt solely with the enforceability of the Settlement Agreement, "Dynatron is in exactly the same position as a patent licensor who

10. The procedural history of the *Clausen Company* case is actually somewhat more complex. In 1985, Clausen filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Dynatron filed a proof of claim in the bankruptcy court based on Clausen's alleged breach of the Settlement Agreement. When Clausen emerged from reorganization, Dynatron filed a two-count complaint in federal court alleging patent infringement and breach of contract. The district court transferred the breach of contract count to the bankruptcy court, but retained jurisdiction over the patent infringement count. The bankruptcy court then granted summary judgment on the contract claim in favor of Clausen. Dynatron appealed this ruling to the district court, while Clausen moved in the district court for summary judgment on the infringement claim. The district court affirmed the bankruptcy court's grant of summary judgment in favor of Clausen on the contract claim, and denied Clausen's motion for summary judgment on the infringement claim. As the Third Circuit noted, the district court's denial of summary judgment on the infringement claim was not appealable, and therefore only the contract claim was before the appellate court.

seeks to enforce the terms of a patent license. The governing rule is that a suit on an agreement such as this is not a civil action arising under the patent laws." *Clausen Co.,* 889 F.2d at 465. The court went on to hold that "the fact that patent misuse and patent invalidity were potential defenses to the proof of claim for enforcement of the contract makes no difference." *Id.* (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)). Thus, because the claim before the court dealt solely with contract law, the Third Circuit held that there was no federal subject matter jurisdiction over the claim.

In *Clausen Company,* the Third Circuit reiterated the principle first articulated by the Supreme Court in *Christianson,* that "a case raising a federal patent-law defense does not, for that reason alone, 'arise under' patent law, 'even if the defense is anticipated in the plaintiff's complaint ...'" 486 U.S. at 809, 108 S.Ct. 2166. In our case, unlike the *Clausen* and *Christianson* cases, Plaintiffs have stated a claim for copyright infringement in their complaint. As such, the *Clausen* holding, in which the federal infringement issue arose only in the context of a defense of a state contract claim, is not applicable to the instant case. *See generally, Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (holding that there is no federal question jurisdiction where the federal issue arose only as a defense). M & M's argument that *Clausen* precludes federal jurisdiction under these circumstances is therefore an overly broad reading of the Third Circuit's holding.

M & M cites a number of other cases in this circuit which purportedly follow the "spirit" of *Clausen.* In *United States Fire Protection Co. v. Monocel,* 53 F.Supp. 989 (D.N.J.1943), the plaintiff brought an ac-

tion to compel the assignment of a patent. The court concluded that because the plaintiff's claim of infringement was based entirely on its claims of ownership based on equitable principles, the case sounded in contract and not in copyright. Similarly, in *Wagner v. B.C. Wagner Group, Inc.,* 1990 WL 198104 (E.D.Pa.1990), the plaintiffs brought a breach of contract action where the object of the contract was the transfer of certain designs protected by federal copyright and trademark law. The defendants attempted to remove the action to federal court, arguing that jurisdiction arose under 28 U.S.C. § 1338. In rejecting federal jurisdiction, the court noted that "[t]he mere fact that a contract concerns itself with trademark, patent, or copyright does not result in federal jurisdiction of a dispute involving that contract." 1990 WL 198104 at *1 (citing *Foxrun Workshop, Ltd. v. Klone Mfg., Inc.,* 686 F.Supp. 86 (S.D.N.Y.1988)). While acknowledging that "federal jurisdiction exists if the plaintiff has directed his pleading against the offending use," the court in *Wagner* held that there was no jurisdiction in the case before it because a claim does not arise under federal law where the plaintiff "merely wants to set the contractual grant aside and seeks recovery for the unauthorized use only incidentally or not at all." 1990 WL 198104, at *1 (citing *Eliscu,* 339 F.2d at 825).

Both *Monocel* and *Wagner* involved a contract claim where the object of the contract was federally-protected intellectual property. The plaintiff in each case did not make a claim for infringement, but merely sought a judgment as to ownership of the intellectual property under the contract. Therefore, these cases were not properly before the federal court under 28 U.S.C. § 1338, because they did not "arise" under federal patent, copyright, or trademark law. In our case, by contrast, Plaintiffs have explicitly alleged infringe-

ment by Defendants through actions such as displaying and copying Plaintiffs' photographs without Plaintiffs' consent. As such, Plaintiffs seek more than merely a determination as to their rights under the contract; they also seek a remedy under the copyright laws.

Finally, M & M cites to *Wolfe v. United Artists Corp.*, 583 F.Supp. 52 (E.D.Pa. 1983). In that case, the plaintiff, proceeding *pro se*, brought an action under the Copyright Act alleging that the defendants had failed to give the plaintiff credit as the author of a published work, and failed to pay the plaintiff royalties for his work. In dismissing the action, the court noted that "nonpayment of royalties, failure to give plaintiff proper authorship credit ... and failure to pay plaintiff [his] share of revenue derived from sales ... are not Copyright Act claims." *Wolfe*, 583 F.Supp. 52, 56 (quoting *Stepdesign, Inc. v. Research Media, Inc.*, 442 F.Supp. 32, 33 (S.D.N.Y. 1977)).

Plaintiffs in our case, as in *Wolfe*, seek relief for Defendants' alleged failure to provide the adjacent copyright credit line. Unlike *Wolfe*, however, Plaintiffs here seek relief for this failure as part of their contract claim, and not under the Copyright Act. Plaintiffs' copyright claims in our case are not for royalties or failure to provide authorship credit as required by the license, but are based instead on Defendants' alleged use of Greenfield's photographs in a manner entirely outside the scope of the contract at issue. *Wolfe* is thus inapposite to the instant case.

It is the view of this Court, therefore, that none of the cases discussed above and cited by M & M in its motion to dismiss provide the proper framework of analysis for the instant case. Instead, the Court looks to cases more analogous to the facts presented here, where the plaintiff-licensor alleges infringement based on the defen-

dant-licensee's use of copyrighted material outside the scope of the license.

The Second Circuit case of *Tasini v. New York Times Co.*, 206 F.3d 161 (2d Cir.2000) is instructive in this regard. *Tasini* involved an author, Whitford, who entered into an express licensing agreement with Time magazine. Whitford alleged that Time had re-licensed his article to a third party in violation of the licensing agreement, thus infringing Whitford's copyright. In holding that Whitford could bring an infringement claim against Time and was not limited to a contract claim, the court reasoned as follows:

the fact that a party has licensed certain rights to its copyright to another party does not prohibit the licensor from bringing an infringement action where it believes the license is exceeded or the agreement breached ... [A]n infringement claim may be brought to remedy unauthorized uses of copyrighted material. (internal citations omitted). Whitford did not, therefore, have the burden of pleading a contract claim against Time.

*Tasini*, 206 F.3d at 170–171.

Thus, under the reasoning of *Tasini*, the fact that a plaintiff brings both contract and copyright claims does not preclude this court from exercising federal question jurisdiction. Indeed, in *New Kids on the Block*, the Court held that it had federal jurisdiction under 28 U.S.C. § 1338 on facts strikingly similar to those of our case. In that case, the plaintiff had licensed the use of her photographs to the defendant for certain specific and limited purposes, based on a signed invoice. *New Kids on the Block*, 780 F.Supp. at 1007. The invoice stated that any additional uses of the photographs would be on terms to be negotiated. *Id.* The plaintiff alleged that the defendant had used the plaintiff's photographs for purposes outside the scope of

the license, and brought an action for copyright infringement. The defendants filed a motion to dismiss, arguing that because the dispute centered wholly on the scope of the license, the dispute sounded in contract, not copyright, and the federal court therefore lacked subject matter jurisdiction.

The court began its analysis by noting that "a copyright licensee can make himself a 'stranger' to the licensor by using the copyrighted material in a manner that exceeds either the duration or the scope of the license." 780 F.Supp. at 1009. Therefore, "once the contract had expired, the defendant had no greater right to use the copyrighted works than any other person, and the plaintiff had stated a claim for infringement arising under the copyright laws." *Id.* (citing *Kamakazi Music Corp. v. Robbins Music Corp.,* 684 F.2d 228, 230 (2d Cir.1982)). While acknowledging that "the existence of subject matter jurisdiction depends on a factual determination of whether the [d]efendant's uses of the Photographs were within the scope of the license," the court concluded that under the circumstances of the case, the plaintiff had stated a claim for copyright infringement. 780 F.Supp at 1009–10. To hold otherwise "would permit any alleged copyright infringer to defeat subject matter jurisdiction by making [a] bland allegation that use of copyrighted material was within the terms of an oral license agreement." *Id.* at 1009.

This Court finds the reasoning of *New Kids on the Block* persuasive. While a claim based entirely on the issue of ownership of copyrighted material under the terms of a contract does not arise under federal law, "the fact that [the plaintiff] claims ownership of the copyrights through a contested contract governed by state law is not fatal to federal jurisdiction." *Vestron,* 839 F.2d at 1382. Indeed,

as the Ninth Circuit has noted, "ownership will almost always be a threshold issue in a copyright infringement action." *Id.* In our case, Plaintiffs assert that TVG and M & M used Greenfield's photographs outside the scope of the license. If these assertions are true, then M & M and TVG stand in the same position as a stranger to the license, and Plaintiffs may bring an action against them for infringement. *Id.; New Kids on the Block,* 780 F.Supp. at 1005.

Therefore, M & M's motion to dismiss Plaintiffs' copyright infringement claims is denied. To the extent that TVG's motion for summary judgment on Count I of the complaint relies upon the argument that this Court lacks subject matter jurisdiction, TVG's motion is also denied.

## II. Summary Judgment

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). *See also Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987).

In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.,* 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences are construed in the light most favorable to the non-moving party. *See Peters v. Delaware*

*River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d Cir.1994).

The substantive law will identify which facts are "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

At the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.1993). Therefore, to raise a genuine issue of material fact, the summary judgment opponent " 'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.; see also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."). In order to determine whether a genuine issue of material fact exists, the court must look to the elements of the civil action pled by the plaintiff.

### B. Contract Claims

In Count III of both complaints, Plaintiffs allege that TVG and M & M, respectively, have each breached their contracts with Plaintiffs by "using photographs for other than agreed purposes, for periods in excess of that permitted in the agree-

ments, by failing to display the required copyright notice, and by failing to pay [TPI] for use of the photographs in violation of the agreements." Second Amended Complaint Against M & M ("M & M Complaint"), ¶ 24; TVG Complaint, ¶ 23.[11] Plaintiffs seek summary judgment against both TVG and M & M under Count III for failure to return certain photographs, and for failure to display the required adjacent copyright credit notice on certain photographs. TVG seeks summary judgment on all Plaintiffs' claims under Count III.

### 1. The Invoices

As noted above, each invoice describes the price, quantity, and type of photograph purchased, and describes the purpose for which each photograph will be used. As such, the invoices contain all the terms necessary to form a contract. Both TVG and M & M acknowledge that their principals signed a substantial number of invoices submitted by Plaintiffs for the photographs at issue in this case. Defendants argue, however, that the terms of the invoices were never discussed between Greenfield and the respective signors, and that the signors never understood or agreed to the terms outlined in the invoices. Under these circumstances, Defendants argue that the invoices cannot constitute a binding contract, notwithstanding the signatures of Bertch, Mumford, or the Rods.

As an initial matter, it is important to note that "it is well settled that affixing a signature to a contract creates a conclusive presumption that the signer read, understood, and assented to its terms." *Fleming Cos. v. Thriftway Medford Lakes,*

---

11. Because the Court has determined, as discussed above, that Plaintiffs' claims under the Copyright Act and Lanham Act "arise under" federal law pursuant to 28 U.S.C. § 1338, this Court has supplemental jurisdiction over the state law contract claim pursuant to 28 U.S.C. § 1367.

*Inc.*, 913 F.Supp. 837, 843 (D.N.J.1995) (citing *Fivey v. Pennsylvania R.R. Co.*, 67 N.J.L. 627, 632, 52 A. 472, 473 (N.J.Err. & App.1902)) (holding that "[t]he fact that the plaintiff did not choose to read the paper, or the material parts of it, before signing, or did not know its contents at the time, cannot, in the absence of actual fraud, relieve him from its obligations."). *See also, e.g., Farris Engineering Corp. v. Service Bureau Corp.*, 276 F.Supp. 643, 645 (D.N.J.1967), *aff'd*, 406 F.2d 519 (3d Cir.1969); *Rudbart v. North Jersey Dist. Water Supply Com'n*, 605 A.2d 681, 685, 127 N.J. 344, 352 (1992); *Moreira Const. Co. v. Moretrench Corp.*, 235 A.2d 211, 213, 97 N.J.Super. 391, 394 (App.Div.1967).

Defendants make no attempt to reconcile their arguments with *Fleming* and the other cases cited above. Instead, Defendants simply argue that there is a disputed question of fact concerning the understanding between their respective representatives and Greenfield. M & M cites to the depositions of Ken Bertch and Roger Mumford, wherein they testified that once they had purchased the photographs from TPI, they believed that they could use them as they saw fit. McCloskey Cert., Ex. N, Bertch Dep. 78:10–80:4; McCloskey Cert., Ex. O, Mumford Dep. 59:20–60:4. Similarly, TVG argues that the Rods did not believe that the invoices represented the terms of their agreement, and cite to Frank Rod's deposition testimony to that effect. Whitteaker Supp. Aff., Ex. 32, F. Rod. Dep. 154:7–155:2. Defendants also argue that because Greenfield never discussed the terms of the invoices with the Rods, Mumford or Bertch, Defendants cannot be said to have understood or assented to them.

■ Plaintiffs dispute the assertions of both TVG and M & M regarding their respective understandings of the invoices. Even under facts analyzed in a light most favorable to Defendants, however, Defendants cannot prevail on this issue. New Jersey contract law clearly binds the signors to the terms of the invoice, absent some fraud or duress, which has not been alleged here. Therefore, Defendants' post-hoc assertions regarding their understanding of the invoices' terms is irrelevant to a determination of Plaintiffs' claims.

TVG attempts to avoid these venerable principles of contract law by citing to *Step–Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91 (3d Cir.1991). In that case, Step–Saver telephoned the defendant and placed an order for software. After the telephone order, Step–Saver would send a purchase order listing the items to be shipped, the purchase price, and terms for shipping and payment. The parties did not refer to any disclaimer of warranties in the purchase orders or during the telephone calls. When the software arrived at Step–Saver, however, each package contained a copy of the "box-top license", which included warranty disclaimers. The *Step–Saver* court was thus faced with a situation where the writings exchanged by the parties did not agree. Because "[i]t [was] undisputed that Step–Saver never expressly agreed to the terms of the box-top license, either as a final expression of, or a modification of, the parties's final agreement," the court concluded that § 2–207 of the Uniform Commercial Code ("U.C.C.") (codified at N.J.S.A. 12:A:2–207) should apply. That section provides, in relevant part, as follows:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made condi-

tional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract ...

939 F.2d at 97 (quoting U.C.C. § 2–207).

Under the plain language of that section, only the terms of the purchase order, and not the additional terms included in the box-top license, applied to the transaction.

As Plaintiffs correctly point out, there is a crucial distinction between *Step–Saver* and the instant case. The Third Circuit in *Step–Saver* explicitly noted that "the President of Step–Saver testified without dispute that he objected to the terms of the box-top license as applied to Step–Saver ... In the absence of a party's express assent to the additional or different terms of the writing, section 2–207 provides a default rule that the parties intended, as the terms of their agreement, those terms to which both parties have agreed." 939 F.2d at 98–99.

In our case, by contrast, Defendants gave their express assent to the invoices by their signatures. A signature is the ultimate form of express assent to a contract. As noted above, affixing a signature to a contract creates a conclusive presumption that the signer assented to its terms. *Fleming Co.*, 913 F.Supp. 837, 843. Defendants thus cannot argue that the signed invoiced do not represent the final agreement of the parties.

### 2. *Course of Dealing*

 ■ M & M adopts a slightly different approach, arguing that the parties'

course of dealing demonstrates that M & M was permitted to use Greenfield's photographs without limitation. M & M notes that the invoices explicitly provide that they are to be governed by the terms of the U.C.C. Specifically, M & M argues that U.C.C. § 2–208 is the appropriate mechanism for analysis in this case.[12] That section, codified as N.J.S.A. 12A:2–208, provides, in relevant part, as follows:

(1) Where the contract for sale involves repeated occasions for performance by either party *with knowledge of the nature of the performance and opportunity for objection to it by the other*, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement ...

N.J.S.A. 12A:2–208 (2003) (emphasis added).

· Thus, in order for § 2–208 to be applicable, Plaintiffs must have had knowledge that M & M was using Greenfield's photographs in a manner violative of the terms of the invoice. M & M argues that "Greenfield was well aware that M & M was regularly using his photographs and photography work in all of its sales and marketing activities, without objection, in whatever means or manner deployed by M & M." M & M Brief in Reply, at 14. M & M fails, however, to cite any evidence in support of this conclusory allegation, other than the fact that Greenfield "took great pride" in M & M's use of his photography to win the prestigious SAM award discussed above. Greenfield's understandable pride in this achievement in no way

12. In its Brief in Opposition, M & M also refers to the arbitration clause in the invoices, and argues that this dispute should be submitted to binding arbitration in Monmouth County, rather than being resolved by this Court. As Plaintiffs correctly point out, because Defendants failed to assert arbitration as an affirmative defense, and have participated in this litigation without demanding arbitration at any time, they have waived the right to raise the issue here. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925–26 (3d Cir.1992).

constitutes a waiver of his copyrights to his photographs. Because M & M has failed to demonstrate Plaintiffs' knowledge of M & M's use of Greenfield's photographs in a manner outside the scope of the invoices, M & M's use cannot be considered as part of a course of dealing pursuant to U.C.C. § 2–208.

■ TVG, on the other hand, has provided the Court with evidence that Plaintiffs were aware of TVG's course of dealing, at least with respect to display of the adjacent copyright credit notices and failure to return photographs. TVG has produced evidence that as early as January 3, 1995, Greenfield was aware that TVG was displaying his photographs at the Whittingham project without the required copyright credit notice, but did not lodge an objection at that time. Whitteaker Aff. Ex. 7, Greenfield Dep. 152:9–155:16; Moreover, TVG has also provided evidence that Greenfield had become suspicious of TVG as early as April, 1996, but nevertheless did not demand the return of his photographs from the Whittingham facility, as he was entitled to do under the terms of the invoice. Whitteaker Aff. Ex. 7, Greenfield Dep. 181:22–182:12.

Plaintiffs, however, also cite to Greenfield's deposition, wherein he testified that during his visit to Whittingham, he "probably" requested that TVG post the required copyright credit notice. Whitteaker Aff. Ex. 7, 154:25–155:4. Moreover, Plaintiffs argue that under the terms of the invoices, TVG had an obligation to return the photographs, and Greenfield's failure to request their return does not constitute a waiver of his rights.[13]

Under these circumstances, a genuine issue of material fact exists as to the course of dealing between TVG and TPI with respect to the display of the copyright credit notice and the return of the photographs. Therefore, TVG's motion for summary judgment on Count III is denied. Plaintiffs' motion for partial summary judgment on Count III against TVG is also denied. Because there is no genuine issue of material fact with respect to the course of dealing between TPI and M & M, Plaintiffs' motion for partial summary judgment on Count III against M & M is granted.

### C. Liability of Individual Defendants

■ Plaintiffs seek a recovery not only from TVG, but also from John and Carol Rod individually. In support of this claim, Plaintiffs cite to paragraph nine of the invoices, which provides, in relevant part, "Client and its principals, employees, agents and affiliates, are jointly and severally liable for the performance of all payments and other obligations hereunder." Whitteaker Aff., Ex. 16; Greenfield Aff., Ex. A.

The Rods argue that they cannot be held liable as individuals because no additional consideration was provided in exchange for their individual liability, and that enforcement of the contract against them would be unconscionable. The Rods argue that it is unreasonable to assume that employees in a business setting who sign an invoice on behalf of their employer have understood and agreed that they are personally liable for the employer's failure to perform the contract. Moreover, the Rods point out that Plaintiffs did not treat the Rods as guarantors of TVG's perfor-

---

13. Plaintiffs cite Carol Rod's deposition testimony for the proposition that there was no detrimental reliance upon Greenfield's failure to demand the return of the Whittingham photographs in 1996 because Carol Rod knew, at that time, that TVG was required to return the photographs. In her deposition, however, Rod merely testified that "I know we're supposed to return any photographs we had." Messina Aff. Ex. K, C. Rod. Dep.71:22–23. This testimony merely demonstrates Carol Rod's knowledge at the time the deposition was taken, and not in 1996.

mance under the contract: Plaintiffs did not provide the Rods with notice of any default or claim under the invoices, but merely submitted a second invoice to their employer, TVG, as discussed above.

The Court agrees with the Rods on this issue. The Rods argue that there is no reported New Jersey case where an employee has been held personally liable for the performance of his/her employer based upon the employee's signature on an invoice, and Plaintiffs have failed to cite any case permitting liability in this circumstance. While it is true that the Rods were not mere employees, but also principals of TVG, Plaintiffs have not raised the issue of piercing the corporate veil, but instead characterize the Rods' liability as "separate agreements to pay TVG's debt." Plaintiffs' Brief in Opposition, at 35. If these are to be considered as separate agreements, however, there must be some consideration provided from Plaintiffs to the Rods. *See generally, Cohen v. Cohen,* 6 N.J.Super. 26, 69 A.2d 752 (App.Div.1949). There is no such consideration apparent in this case. Thus, the Rods cannot be held individually liable for TVG's failure to perform under the invoices.[14]

Therefore, the Rods' motion for summary judgment with respect to the claims against the Rods as individual defendants is hereby granted, and Frank Rod, Carol Rod, John Rod and Norma Rod are hereby dismissed as defendants in the case. Plaintiffs' motion for summary judgment with respect to the personal liability of the Rods is correspondingly denied.

### D. Copyright Claims

#### 1. TVG

In Count I of their complaint, Plaintiffs allege that TVG has infringed upon Plain-tiffs' copyrights by using Greenfield's photographs in TVG's promotional materials, and by supplying Greenfield's photographs to TVG's clients without Plaintiffs' authorization or consent. Plaintiffs further assert that TVG has infringed upon their copyrights by unauthorized reproduction of Greenfield's photographs. Plaintiffs seek summary judgment for TVG's display of certain of Plaintiffs' photographs at the Vineyards and Whittingham projects in excess of one year, and for copying four internegatives of Greenfield's photographs, which were supplied by TVG to M & M. TVG argues that Plaintiffs have no infringement claim on any of the facts alleged, and therefore seeks summary judgment on all Plaintiffs' claims under Count I.

#### (a) Unauthorized Reproduction of Photographs

■ TVG admits that it copied Greenfield's photographs to provide enlargements for M & M. In its motion papers, TVG somewhat opaquely states that "M & M supplied four slides of the [M & M] design center to Twin Vision. Twin Vision arranged to have prints made, which were used in displays at M & M sales centers." TVG's Brief in Support, at 5. M & M ultimately paid TPI for the display of these prints, as reflected in the June 27, 1996 invoice. TVG argues that by accepting payment from M & M, TPI effectively ratified TVG's role in supplying the prints to M & M, and thus TPI has no claim against TVG. In essence, TVG argues that because M & M paid the full price to TPI for these prints, any additional payment from TVG would amount to a double recovery.

---

**14.** The Rods also argue that the statute of limitations has expired with respect to Plaintiffs' claims against them. Because the Court has dismissed the claims against the Rods on other grounds, it is unnecessary to address the statute of limitations issue.

Plaintiffs concede that M & M paid the full price for the four photographs. Nevertheless, Plaintiffs argue that both TVG and M & M are each separately liable for infringement: TVG is liable for producing the internegatives, while M & M is liable for the separate act of unauthorized display of Greenfield's work. Thus, Plaintiffs argue, the fact that M & M has settled its liability to Plaintiffs for the display does not absolve TVG of its liability for creating the internegatives.

The only case TVG cites in support of its argument here is *Effects Associates v. Cohen*, 908 F.2d 555 (1990). In that case, the plaintiff, a special effects company, supplied footage to the defendant for a movie involving an invasion of Earth by aliens taking the form of frozen yogurt. The parties memorialized their agreement in a letter outlining the work to be done, but without specifying who would own the copyrights to the finished product. The defendant was ultimately unsatisfied with the footage, and paid the plaintiff only half the amount previously agreed upon. Nevertheless, the defendant incorporated the plaintiff's footage into the final version of his horror movie, "the Stuff". The plaintiff subsequently filed suit in federal court, alleging copyright infringement, and the court dismissed the plaintiff's copyright claim.

TVG interprets *Cohen* to stand for the proposition that "if a party is not satisfied with the outcome of a business arrangement and there is a dispute over payment, an infringement action will be barred." TVG's Brief in Opposition, at 7. This Court rejects TVG's reading of *Cohen*. In reaching its conclusion in that case, the Ninth Circuit held that the plaintiff had no federal copyright claim because the plaintiff had granted the defendant an implied, non-exclusive license:

Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it. To hold that Effects did not at the same time convey a license to use the footage in "The Stuff" would mean that plaintiff's contribution to the film was 'of minimal value,' a conclusion that can't be squared with the fact that Cohen paid Effects almost $56,000 for this footage. 908 F.2d at 558–59.

Unlike *Cohen*, our case does not involve a dispute over payment or the quality of the product. Whereas in *Cohen* the plaintiffs conveyed the product to the defendant with the understanding that it would be used for a horror film, Plaintiffs in our case did not convey the four internegatives at all. Rather, Plaintiffs discovered that TVG and M & M had illicitly copied Plaintiffs' photographs without Plaintiffs' knowledge or consent. Plaintiffs therefore cannot be said to have granted TVG an implied, non-exclusive license to copy these four prints, because Plaintiffs were unaware that such copying ever occurred. *Cohen* is thus inapposite to our analysis here. The Court therefore concludes that TVG is liable for copyright infringement for the unauthorized copying of Plaintiffs' four photographs into internegatives. *Major League Baseball Promotion Corp. v. Colour–Tex, Inc.*, 729 F.Supp. 1035, 1039 (D.N.J.1990).

There may be an issue, however, with respect to the possibility of a double recovery on these prints, because M & M has purportedly already paid Plaintiffs the full value of the four prints. Because the issue of damages has been bifurcated from the instant motions, the Court will reserve judgment on this issue at this time.

*(b) Unauthorized Display of Photographs*

■ Similarly, TVG concedes that Greenfield's photographs were displayed

at the Whittingham and Vineyards sales centers for longer than the one-year term authorized in the invoices. TVG asserts, however, that Greenfield was aware of TVG-designed sales centers in which Greenfield's photographs had been displayed beyond one year. TVG's Facts, ¶ 13 (citing Whitteaker Aff., Ex. 7, Greenfield Dep., 100:9–23). All parties agree that Greenfield visited the Vineyards and Whittingham projects in 1997 and 1998, respectively, and observed his photographs displayed beyond the one-year term of the license. Plaintiffs argue that Greenfield first learned of TVG's unauthorized display of his photographs through these visits. TVG, on the other hand, claims that Greenfield had prior knowledge that his photos were displayed longer than one year, and that notwithstanding this prior knowledge, Greenfield did not raise any objection until his 1997 and 1998 visits to the Vineyards and Whittingham projects. TVG therefore argues that Greenfield's failure to lodge a timely objection to the display of his photographs beyond one year constitutes an implied, non-exclusive license for TVG's continued use of the works. Therefore, TVG urges this Court to find that Plaintiffs are estopped from bringing an infringement claim on this issue.

In TVG's Statement of Undisputed Material Facts, TVG asserts that "Greenfield was aware of Twin Vision designed sales center[s] where TPI-supplied photograph materials were in use beyond one year." TVG's Facts, ¶ 19. The crucial question, of course, is *when* Greenfield acquired this knowledge. In support of its argument that Greenfield had such knowledge prior to his visits to the Vineyards and Whittingham projects, TVG cites two pieces of evidence: Greenfield's deposition testimony, page 100, lines 9–23, and Frank Rod's deposition testimony, page 160, lines 14–24.

In the Greenfield deposition testimony cited by TVG, Greenfield was asked whether, "*as you sit here today* do you know of development sales centers that exceeded, considerably exceeded a one-year time period?" Greenfield Dep., 100:9–11 (emphasis added). Greenfield named several facilities in response to this question. This testimony was taken on January 6, 1999. It is unclear how Greenfield's knowledge in 1999 supports TVG's assertion that Greenfield knew of unlicensed displays *while they were occurring* in 1995 through 1998. There is no question that by 1999, Greenfield knew of sales centers which exceeded the one year restriction on display of his photographs. Indeed, such knowledge was likely a significant factor in Plaintiffs' decision to bring the instant lawsuit. The relevant question, of course, is whether Greenfield or TPI were aware of the unlicensed displays prior to Greenfield's visits to the Vineyards and Whitteaker projects in 1997 and 1998, respectively. The testimony cited, which focuses solely on Greenfield's knowledge in 1999, does not address the issue of Greenfield's knowledge during the relevant time period.

The Frank Rod testimony cited by TVG is even less helpful. Page 160 of Frank Rod's deposition contains the following exchange:

Q: Can you tell me what jobs you're aware of that Greenfield or [TPI]'s photos were used for more than one year?

A: Oh, boy. I would say Greenbrier at Whittingham. I would say Vineyard's but that—Vineyard's was just over one year. I would say good half a dozen Matzel & Mumford jobs, Amridge, High Point come to mind. I think Radiance from M. Rieder Companies was more than a year. Did I say Whittingham? I

said Greenbrier? High Point? Did I say High Point?

Whitteaker Aff., F. Rod Dep. 160:14–24.

This testimony merely establishes a fact which is undisputed in this litigation: that a number of Plaintiffs' photographs were displayed at Whittingham, Vineyards, and M & M sales centers beyond one year. Frank Rod's testimony fails to establish that Plaintiffs had prior knowledge that Greenfield's photographs were displayed in excess of one year.

In addition, TVG alleges that Greenfield knew that TVG used his photographs at its trade show booths in annual conventions from 1993 through 1997. TVG's Facts, ¶ 32. Such continued use for a four-year period would, of course, be inconsistent with the one-year time period specified in the license. In TVG's Statement of Undisputed Material Facts, TVG asserts that "Greenfield knew that the TPI photographic materials were used in Twin Vision's promotional brochure and at Twin Vision's trade show booth at the building industry's annual conventions in Atlantic City" and that "Greenfield attended the building industry trade show in Atlantic City in 1996." TVG's Facts, ¶ 32 (citing Greenfield Dep. 95:6–16; 24–25).

In support of this assertion, TVG relies upon Greenfield's deposition testimony at page 95. A review of this testimony, however, reveals that Greenfield attended two conventions, one in 1993, and another in 1997. Messina Cross–Aff., Ex. E., Greenfield Dep., 95:6–96:20. Plaintiffs concede that the brochure displayed by TVG at the 1993 convention included one of Greenfield's photographs. Plaintiffs' Brief in Opposition, at 17. In addition, Greenfield admitted that "I assume whenever John [Rod] or whomever went out on sales calls to a potential client that he would, among other things, provide a copy of the brochure." Greenfield Dep., 95:6–13. Thus,

Greenfield acknowledged that TVG's use of the photographs was not limited solely to the convention. It should be noted, however, that Greenfield testified that he never saw the promotional brochure again at any time between the 1993 convention and the 1997 convention. *Id.* When he attended the 1997 convention, the brochure he saw displayed by TVG was not the same brochure as had been displayed at the 1993 convention. *Id.*

Based on this testimony, TVG argues that Greenfield knew and understood that TVG used the photographs supplied for the 1993 convention for longer than one year. As such, TVG asserts that this use goes to prove that the parties had an implicit understanding that all photographs supplied by Plaintiffs to TVG could be used for longer than one year.

As an initial matter, it is not clear from the testimony quoted above that Greenfield necessarily believed that TVG's use of his photographs extended over one year beyond the 1993 convention. Given that TVG participated in the convention annually, it is reasonable to assume that TVG would use a new brochure each year. Indeed, when Greenfield returned to another convention four years later, TVG was using a different brochure. Therefore, Greenfield's testimony proves only that he assumed TVG used his photographs for a one-year period from the 1993 convention until the 1994 convention. Such use would not be contrary to the one-year restriction placed on the use of photographs at the Whittingham and Vineyards facilities.

Even assuming, *arguendo*, that Greenfield believed that TVG used his photographs in its brochure for longer than one year, this use is in a very different context from sales center displays. While Greenfield's testimony regarding the 1993 convention may be relevant to a claim involving the brochures, it does not constitute

evidence that Plaintiffs had knowledge of TVG's use of Greenfield's photographs at the Vineyards and Whittingham facilities. Therefore, while there is a genuine issue of material fact as to the parties' understanding regarding use of Greenfield's photographs in TVG's promotional brochures, there is no such issue with respect to the Vineyards and Whittingham sales displays. TVG has provided no evidence, either direct or circumstantial, that Plaintiffs knew of TVG's use of the photographs at the Vineyards and Whittingham projects beyond the one year license term.

### 2. *M & M*

In Count I of their complaint, Plaintiffs allege that M & M has infringed upon Greenfield's copyright by using Greenfield's photographs without Plaintiffs' authorization or consent. Plaintiffs further allege that M & M unlawfully copied Plaintiffs' photographs, displayed them in M & M's sales centers, published them in periodicals and posted them on the M & M website, all without Plaintiffs' authorization or consent. With respect to M & M, Plaintiffs seek summary judgment under Count I of the complaint for displaying Plaintiffs' photographs in excess of one year, copying of Greenfield's photographs displayed in M & M's sales centers, and for the unauthorized use of Plaintiffs' photographs on the M & M website. As discussed above, M & M's motion to dismiss

Plaintiffs' infringement claims has been denied, and therefore the Court will address Plaintiffs' motion for summary judgment on these claims.

M & M does not deny that it copied some of Greenfield's photographs displayed in M & M sales centers, or that it displayed some of Greenfield's photographs in excess of one year, or that it used Greenfield's photographs on the M & M website. Instead, M & M claims that it is unclear which particular photographs are the subject of Plaintiffs' assertions. Therefore, M & M argues Plaintiffs cannot establish the first element of their contract claim, that Plaintiffs own a valid copyright to the specific works in question. *See, e.g., Major League Baseball,* 729 F.Supp. at 1035.

In response to M & M's argument, Plaintiffs have submitted an additional affidavit, sworn by Greenfield, which specifies precisely which photographs are the subject of Plaintiffs' allegations. In the affidavit, Greenfield includes four complete copyright registration packets for photographs displayed by M & M. Each packet includes the photographs themselves, which have each been assigned a number. The registrations cover a total of 45 photographs displayed at M & M locations. Reply Affidavit of David Greenfield in Support of Plaintiffs' Motion for Summary Judgment, ("Greenfield Reply Aff."), Ex. D–G.[15] Greenfield's affidavit also specifies

---

**15.** The copyright certificates provide as follows:

1. Registration # VAu 395–687, dated March 18, 1997 for 16 photographs:
 # 051695A–10, # 992D–21, # 1094–B6, # 992B–3, # 1194–18, # 050995B–2, # 050995–25, # 050995–A–4, # 050995–A–7, # 051695B–2, # 051695A–2, # 992D–10, # 992C–12, # MM71691B–20, "RUTGERS", "GOLF".
2. Registration # VAu 395–686, dated March 18, 1997, for 7 Photographs:

"PRINCETON", # 992C–22, # 992C–5, # 1194–11, # 992D–X–7, # 090294–12A, # 992A–10

3. Registration # VAu 846–634, dated April 4, 1997, for 16 Photographs:
 # M082394–14 (3 versions), # MM71691B–20; # 992A–10 (3 versions), # 080495–10, # 1094–B, # 090294–10A, # 992C–5, # 050995A–25, # 050995A–7, # 1094B–4, # 051695B–10, # 051695A–2.
4. Registration # VAu 437–696, dated June 5, 1998, for 6 Photographs:

which of these registered photographs he discovered at six M & M locations, none of which had been ordered for use at those locations. *See* Affidavit of David Greenfield in Support of CrossMotion ("Greenfield Cross–Aff."), ¶ 5, Sch. 1. The affidavit further identifies which of the registered photographs were displayed in excess of one year. *Id.*, Sch. 1, Ex. M. Finally, the affidavit specifies which of the registered photographs were displayed on the M & M website, and includes a print-out from the website. *Id.* Sch. 1; Greenfield Aff. Ex. Q.

Each photograph Plaintiffs rely upon in their infringement claim against M & M corresponds to a copyright registration packet, with the exception of photograph # 051695–C–2, which Greenfield saw displayed at the Seven Oaks facility. Greenfield Cross Aff., Ex. M. This photograph does not appear to be included in any of the copyright registration packets submitted Plaintiffs. With the exception of this photograph, the Court finds that Plaintiffs have demonstrated copyright registration of the remainder of the photographs in question with sufficient specificity. The Court thus rejects M & M's argument on this issue. Therefore, Plaintiffs' motion for summary judgment with respect to M & M's copying of Plaintiffs' photographs listed in Schedule 1 of the Greenfield Reply Affidavit is hereby granted, with the exception of photograph # 051695–C–2. Plaintiffs' motion for summary judgment with respect to the photographs displayed on M & M's website as listed in exhibit Q of the Greenfield Reply Affidavit is also granted.

### 3. *TVG and M & M: Implied, Non-exclusive License*

■ Notwithstanding the paucity of evidence in support of their assertions, both M & M and TVG argue that Plaintiffs' continued failure, for several years, to object to Defendants' use of photographs beyond the one year term led Defendants to reasonably believe that such use was permissible under an implied, non-exclusive license.

All parties cite to the case of *MacLean v. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 780 (3d Cir.1991). In that case, the plaintiff created the JEMSystem computer software, to which he owned a copyright. In 1986, the plaintiff supplied disks of the JEMSystem to the defendant, without placing any restrictions on the use of the disks or advising the defendant of his belief that he had rights to the JEMSystem. The plaintiff knew that the defendant would be using the software for its client, the New York Stock Exchange ("NYSE"), as the plaintiff and defendant had worked together on this project for a number of years. The defendant subsequently copied the JEMSystem and began marketing it in 1997. The court held that under these circumstances, the plaintiff gave the defendant an implied, non-exclusive license to use the JEMSystem in furtherance of its relationship with NYSE. In reaching this conclusion, the court held that "a nonexclusive license may arise by implication where the creator of a work at a defendant's request 'hand[s] it over', intending that defendant copy and distribute it." *MacLean*, 952 F.2d at 779 (quoting *Effects Associates*, 908 F.2d at 559 n. 6). The court was careful to note, however, that any nonexclusive implied license was limited solely to the NYSE account, because the plaintiff "never gave [the defendant] any indication that [the defendant] could exploit the JEMSystem to the extent

# 031597–5 MAPLEHURST, unlabeled photo of building with trees; unlabeled photo of golf course; # 091497–2 B. MANOR; unla-beled photo of balloons; unlabeled photo of cathedral tower.

that it allegedly did by copying parts of it wholesale into a computer program." 952 F.2d at 779.

The scope of the non-exclusive, implied license in *MacLean* is instructive. The plaintiff in that case knew that the defendant would be using the copyrighted material for the NYSE project, and provided the software to the defendant for that purpose. Similarly, in our case, Greenfield provided the photographs to Defendants with the understanding and intent that the photographs would be displayed for only one year. Thus, Defendants could argue that an implied, non-exclusive license existed for this limited purpose. Defendants do not make such an argument because in our case, unlike *MacLean*, there is a written agreement setting forth the terms of the license. Instead, Defendants urge this Court to find that an implied license existed which expanded the scope of the agreement significantly beyond the original terms.

Defendants' argument is similar to the argument made by the defendants in *MacLean*. In both *MacLean* and the instant case, there is no evidence that the licensor ever gave any indication that the licensee could exploit the copyrighted materials outside of the terms of the original understanding. Moreover, Defendants have presented the Court with no admissible evidence that Greenfield even knew of, much less consented to, their use of his photographs beyond the one year license term. In this context, a later section of the *MacLean* opinion is instructive. In reversing the district court's grant of a directed verdict for the defendant-infringer, the court reasoned that "the district court's laches rationale would have put [the plaintiff] under a never ending obligation to discover whether anyone to whom he ever supplied his software would copy it. The Copyright Act does not rec-

ognize such an obligation." 952 F.2d at 780. Under the circumstances, it was unreasonable and unwarranted for Defendants to assume that they had an implied license to display Greenfield's photographs beyond one year.

Defendants cite to a number of other cases in which courts held that an implied, nonexclusive license existed for the use of copyrighted materials. In each case, the court concluded that equitable principles barred the licensor from bringing an infringement action against the licensee. *See Silva v. MacLaine*, 697 F.Supp. 1423 (E.D.Mich.1988); *Burke v. Medical Economics* Co., 1982 WL 1164 (D.N.J.1982); *Wiegand Co. v. Harold E. Trent Co.*, 122 F.2d 920 (3d Cir.1941). In all of these cases, the court clearly found, as a matter of fact, that the defendant had knowledge of the plaintiff's purportedly infringing use of the copyrighted material and did nothing. For example, in *Silva*, the plaintiff brought an action against the defendant for publishing a book which infringed upon the defendant's copyrights. Although the plaintiff did not bring the legal action until 1987, the plaintiff had reviewed a draft manuscript of the defendant's work in 1981, received an autographed copy of the book in 1983, and was informed of a television series made from the book in 1985–86. During all of this time, the defendant did not lodge any protest to the plaintiff's purported use of the defendant's materials. Under these circumstances, the court quite reasonably found that the plaintiff was estopped from bringing an action for infringement.

Cases such as *Silva* are distinguishable from the instant case in two important respects. First, as previously noted, TVG has failed to provide a single piece of admissible evidence to show that Plaintiffs had knowledge of TVG's infringing actions during the relevant time period. Second,

the defendants in *Silva, Burke* and *Wiegand* each incurred great expense in producing, printing and/or distributing the copyrighted material. In our case, by contrast, TVG has not established that it incurred any additional expense by simply displaying Greenfield's photographs on display in excess of one year.

Therefore, the Court finds that there is no genuine issue of material fact that would preclude a reasonable jury from finding that Defendants infringed upon Plaintiffs' copyright by displaying Greenfield's photographs for longer than one year. Therefore, Plaintiffs' motion for partial summary judgment on this issue is granted with respect to Plaintiffs' claims against both TVG and M & M.

### E. *Lanham Act Claims*

Plaintiffs also assert a Lanham Act claim against both TVG and M & M. Somewhat confusingly, M & M devotes a substantial portion of its Brief in Opposition to an argument concerning the inadequacy of Plaintiffs' Lanham Act claims. Plaintiffs, however, have not sought summary judgment on the Lanham Act claims. Moreover, M & M does not incorporate any of the substantive Lanham Act arguments in its Motion to Dismiss, which focuses solely on the "arising under" question discussed in Section I, *supra.* Instead, in its Brief in Opposition, M & M argues that, even assuming that this case does "arise under" the federal copyright laws, the Lanham Act does not apply to the specific facts of this case.

While the Court is somewhat tempted to address M & M's Lanham Act arguments for the sake of judicial economy, such an action would be premature because there are no pending motions with respect to

Plaintiffs' Lanham Act claims against M & M. Therefore, the Court will not discuss these claims in the context of the instant motions.

TVG, however, has made a motion for summary judgment on all of Plaintiffs' claims, including the Lanham Act claims. Section 43(a) of the Lanham Act, codified as 15 U.S.C. § 1125, provides in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125 (2003).

Plaintiffs appear to base their Lanham Act claims against TVG on their allegation that TVG sold what purported to be "photo rights" in Greenfield's works to the Vineyards in 1996. In support of this assertion, Plaintiffs have produced an invoice from TVG to the Vineyards, dated April 1, 1996, which states that "Photo rights for beach shot will be purchase[d] by client (Client will provide Neg. to TVG)." Messina Aff., Ex. J.[16] TVG denies that it ever made an affirmative false claim that it was the source of the photographic works.

---

**16.** As this is an invoice between TVG and the Vineyards, the "client" referred to in the in-

voice is clearly the Vineyards.

Moreover, as discussed above, TVG argues that through their course of dealing, Plaintiffs have waived any objection to TVG's failure to provide copyright credit notices on Greenfield's work.

The Court need not resolve this dispute in the instant motion. As discussed above, the Court has concluded that a genuine issue of material facts exists as to the course of dealing between TVG and TPI with respect to the copyright credit notices. Under these circumstances, genuine issues of material fact also exist as to Plaintiffs' Lanham Act claims against TVG.[17] Therefore, TVG's motion for summary judgment on the Lanham Act claims is denied.

### F. TVG's Counterclaims

TVG has filed four counterclaims in this matter. The first counterclaim asserts that TPI failed to return photographic material belonging to TVG. The second, third and fourth counterclaims, alleging consumer fraud, breach of the covenant of good faith and fair dealing, and interference with TVG's prospective economic advantage, arise from TVG's assertion that TPI engaged in business with TVG's clients without TVG's knowledge or consent. Plaintiffs have filed a motion for summary judgment on the counterclaims.

With respect to the first counterclaim, Plaintiffs argue that the only material TVG ever furnished to Plaintiffs was one artist's rendering, which was timely returned to TVG. Greenfield Aff. ¶ 47. Plaintiffs cite John Rod's deposition wherein he admitted that none of the other items upon which TVG bases this counterclaim were involved in work Plaintiffs performed for TVG. Messina Aff. Ex. R., J. Rod. Dep 11:18–12:20.

With respect to the second, third and fourth counterclaim, Plaintiffs argue that there was never any agreement between Plaintiffs and TVG which prohibited Plaintiffs from performing work directly for TVG's clients. Indeed, Plaintiffs have produced evidence that John Rod referred Greenfield to his clients so that Greenfield could do business for the clients. Messina Aff., Ex. I, J. Rod. Dep. 71:1–5.

In their motion papers, TVG makes no attempt to defend its counterclaims or to respond to Plaintiffs' arguments. Under these circumstances, the Court will grant Plaintiffs' motion for summary judgment as to TVG's counterclaims.

### III. Statutory Damages and Attorneys' Fees

 As a final matter, TVG argues that even if Plaintiffs prevail on their copyright infringement claims, they are not entitled to statutory damages under the Copyright Act. The relevant section of the Copyright Act, codified at 17 U.S.C. § 412, provides, in relevant part, that "[i]n any action under this title ... no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for ... any infringement of copyright in an unpublished work commenced before the effective date of its registration." 17 U.S.C. 412 (2003). In interpreting this statute, a federal appeals court has noted that "[e]very court to consider this question has come to the same conclusion; namely, that infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs." *Johnson v. Jones,* 149 F.3d 494, 506 (6th Cir.1998) (collecting cases).

---

**17.** Even assuming TVG prevailed on the course of dealing argument, the April 1996 invoice wherein TVG sold "photo rights" to the Vineyards would be sufficient to preclude summary judgment in favor of TVG on the Lanham Act claim.

Plaintiffs do not appear to dispute TVG's view of the law on this issue, and concede that they are not entitled to statutory damages or attorneys' fees under the Copyright Act for the photographs TVG supplied to M & M, or for the photographs displayed at the Whittingham project, or for TVG's promotional brochures.[18] Thus, the only dispute with respect to statutory damages and attorneys fees under § 412 concerns the Vineyards photographs.

As noted above, the original invoice for the six photographs used in the Vineyards display is dated April 3, 1996. Plaintiffs sent TVG an invoice for the continued use of these photographs beyond the one-year term on April 21, 1997. Greenfield filed for copyright registration of these photographs on April 25, 1997.

TVG argues that the infringement with respect to the Vineyards display began on April 3, 1997. Because this infringement occurred prior to the copyright registration, TVG concludes that Plaintiffs are not entitled to statutory damages or attorneys' fees under § 412 for the Vineyards photographs.

Plaintiffs argue, however, that by the terms of the invoice, TVG's one year license did not begin to run until full payment was made. Paragraph four of the invoice for the Vineyards photographs states, in relevant part, "[n]o rights are granted until timely payment is made." Greenfield Aff., Ex. A. The invoice contains a handwritten notation indicating "pd balance 1146.00 chk # 18708 paid 5/15." Greenfield Aff., Ex. A. Plaintiffs therefore argue that the invoice did not become effective until May 15, 1996, and thus did not expire until May 15, 1997, a date later than the copyright registration date of April 25, 1997. Under these circumstances, Green-

field may be entitled to statutory damages and attorneys' fees pursuant to § 412.

Therefore, TVG's motion for summary judgment as to Plaintiffs' claims for statutory damages and attorneys' fees is granted as to the Whittingham photographs, the photographs displayed in the promotional brochures, and the four internegatives TVG supplied to M & M. TVG's motion for summary judgment as to Plaintiffs' claims for statutory damages and attorneys' fees with respect to the Vineyards photographs is denied.

### Conclusion

For the reasons outlined above, the following orders shall be entered:

1. TVG's counterclaims against Plaintiffs shall be DISMISSED.

2. TVG's motion for summary judgment on Counts I (copyright infringement), II (Lanham Act), III (contract), and IV (*quantum meruit*) of Plaintiffs' complaint is DENIED, except that the Court finds that Plaintiffs shall not be entitled to statutory damages or attorneys' fees under 15 U.S.C. § 42 with respect to the Whittingham photographs, the photographs displayed in the promotional brochures, and the four internegatives TVG supplied to M & M.

3. Plaintiffs' claims against the Rods shall be DISMISSED, and the Rods shall be dismissed as defendants in this action. TVG's motion for summary judgment as to Count V of Plaintiffs' complaint is correspondingly GRANTED.

4. M & M's motion to dismiss Plaintiffs' complaint pursuant to F.R.C.P. 12(b)(1) and 12(h)(3) is DENIED.

5. Plaintiffs' motion for partial summary judgment as to Count I against TVG is GRANTED as to the photographs dis-

---

**18.** Plaintiffs do demand attorneys' fees for these photographs pursuant to the invoices.

This issue, however, is not before the Court at this time.

played at the Whittingham and Vineyards facilities, and DENIED as to the four internegatives TVG supplied to M & M.

6. Plaintiffs' motion for partial summary judgment as to Count III against TVG is DENIED.

7. Plaintiffs' motion for partial summary judgment as to Count I against M & M is GRANTED with respect to all relevant photographs except # 051695–C–2.

8. Plaintiffs' motion for partial summary judgment as to Count III against M & M is GRANTED.